IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
CHARLESTON DIVISION

| | | |
|---|---|---|
| Thomas P. Daly, | ) | |
| | ) | C/A 2:06-1733-DCN |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | **OPINION and ORDER** |
| | ) | |
| Trudy Zobel; David Hinson; Officer | ) | |
| John Rodriguez; and Captain Donoghue, | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

This matter is before the court on two motions for summary judgment arising out of a civil rights claim under § 1983, alleging malicious prosecution. Plaintiff contends that his arrest for "disturbing schools" was maliciously motivated and without justification.

## I.  BACKGROUND

Plaintiff is a former Charleston County Deputy Sheriff and current Naval Reserve Commander who was arrested for "disturbing schools" after a confrontation with his daughter's teacher (Mr. Hinson) at Flowertown Elementary School. He claims that the teacher and the school principal (Ms. Zobel), as well as the investigating officer (Ofc. Rodriguez) and his supervisor (Capt. Donoghue) acted with "actual malice" and abused their power by instituting and pursuing these charges knowing that they were false.[1]

---

[1] Plaintiff originally filed a claim for recklessness and gross negligence, under both the South Carolina Tort Claims Act and § 1983, against these same defendants, plus Dorchester County School District II and its superintendent and assistant superintendent, the chairman of the school board and the Summerville Police Department. See Daly v. Dorchester Sch. Dist. II, No. 2:06-280-DCN. The court dismissed the complaint without prejudice because the statute of limitations on the tort claims had run.

Both the first action and this action were originally brought in state court, but were

*Undisputed Facts*

Plaintiff's nine-year-old daughter became upset one evening in August 2002 over the loss/theft of her spelling book. The daughter indicated that her teacher (Mr. Hinson) told her that "lost items are not his problem." Somehow, the parents became concerned that their daughter was "terrified" of Mr. Hinson and went to the school the next day to speak to him about it.

After signing in and being told that the principal (Ms. Zobel) was in a meeting, plaintiff went to Mr. Hinson's classroom. Plaintiff's wife was already in the room.[2] Hinson asked plaintiff who he was; plaintiff explained he was a parent and "wanted to know why his daughter was terrified of her teacher." A confrontation ensued (most facts of which are disputed), during which Hinson placed his hand upon the plaintiff. Thereafter, plaintiff returned to Zobel's office to complain of an assault and battery upon his person.

Plaintiff spoke with Zobel about the incident, then left the office and called police to report the assault and battery. Officer John Rodriguez arrived and took statements from plaintiff, Zobel, Hinson and at least one other teacher who witnessed all or part of the altercation. No arrests or other detentions were made.

Plaintiff and his wife later visited the Summerville Police Department to read the report Rodriguez prepared. It listed Hinson as the victim and plaintiff as the perpetrator.

---

removed by the defendants. Shortly after the instant complaint was filed, defendants moved for dismissal on grounds of res judicata. The court denied the motions after hearing arguments.

[2] Hinson claims that both parents began rifling through papers and other students' cubbyholes looking for the book; plaintiff claims that his wife was having a conversation with Hinson when he entered the classroom.

2

Upon their request, another officer took a supplemental statement from plaintiff and his wife, outlining their version of events. When plaintiff returned to the station a few days later to discuss the reports, he was arrested for disturbing schools and spent nearly twenty-four hours in a segregated cell due to his former position in law enforcement.

The disturbing schools charge was bound over after preliminary hearing, but it was dismissed in December 2003. A charge of public disorderly conduct, in violation of Summerville ordinances, was added on December 11, 2003 but dismissed in April 2005.[3] The affidavit supporting both charges was signed by principal Zobel. The charges were expunged in late May and early June 2005.

*Disputed Facts*

The parties dispute what happened in Hinson's classroom. Hinson asserts that, "as both of the – the parents were basically rummaging through the classroom, I asked Mrs. Daly to step over. Then she basically told me that the family had been upset all night because the daughter couldn't find the spelling book. And I then asked Mis – Mr. Daly to stop what he was doing and step over and – which is when the incident began." Hinson claims he told the parents "in a very calming manner . . . that they shouldn't be doing what they were doing and that we have procedures for finding the spelling book. And at that time, I touched Mr. Daly on the shoulder. And he reacted violently toward me, telling me that . . . I touched him, and he was going to call the police."[4]

---

[3] There is no evidence that plaintiff was actually arrested on this second charge. He asserts that the disturbing schools charged was "reduced to a lesser charge" in December 2003.

[4] Hinson also indicated that, after plaintiff left the classroom, Mrs. Daly "confided" in him "more than one time" that "she had spoken to him before they came to school asking him not to – in fact, I remember her words – she says, I asked him not to come to the school and do this."

Plaintiff claims that he entered the classroom separately from his wife, and Hinson asked him who he was. He said he was a parent and asked Hinson why his daughter was afraid of him. Then, "Hinson approached the Plaintiff and grabbed the Plaintiff's arm. The Plaintiff broke the Defendant's hold. As the Plaintiff left the room, the Plaintiff informed Mr. Hinson that he was a former Deputy Sheriff and that he was going to call the police." In deposition, plaintiff asserted that Hinson grabbed his arm, twisted it, and forced him backwards towards the door.

Zobel interviewed two of the children who were in Hinson's classroom at the time. She testified that they told her that Hinson "patted" plaintiff, either on the arm or the back, and then plaintiff "started screaming and shaking his finger in Mr. Hinson's face and threatening to call the police." Zobel later asked the students to write down in their own words what had happened.[5]

There is also some dispute over what occurred in principal Zobel's office. She contends that after plaintiff related his version of events – in which he claimed only that Hinson "touched" his arm – he asked that his daughter be removed from the class. She indicated that it would take some time, which apparently "was not good enough."

Plaintiff then said something "about the timing" of the incident that led Ms. Zobel to realize "that all of this transpired after the children would have been . . . coming into

---

Hinson further testified that Mrs. Daly offered "several other apologies": "I'm sorry, I'm sorry he did this. I could tell by her mannerisms, her attitude, her words that she was really appalled by his behavior." There is only one page of Mrs. Daly's deposition in the record, and it is not relevant to this issue.

[5] Plaintiff attempts to discredit the students' written statements about the incident by noting that they received chocolate as a "reward" for doing so.

4

the classrooms, and I asked him at that point were there any children in the room." Plaintiff "became very irate [and] jumped out of his seat and started I won't say . . . screechy screaming, but yelling at me that . . . I was accusing him of a felony." She tried to explain that she wanted "to know everything that happened, and I want to make sure there are no disturbing school issues," when plaintiff "yelled again and flew – flung open my office door and was kind of yelling at me as he exited."[6]

Plaintiff, on the other hand, asserts that he sat down with Zobel and informed her of "all the events that lead [sic] up to the assault. Ms. Zobel informed the Plaintiff that he was disturbing school and was going to jail. The Plaintiff called 9-1-1 to have an officer come to the school and take statements regarding the assault just committed against him."

The lynchpin of plaintiff's case is his claim that Officer Rodriguez confessed that a "Detective Harmon" (a friend of principal Zobel)[7] ordered him to destroy his original report, naming Hinson as the perpetrator and plaintiff as the victim, and to re-write it to make Hinson the victim. Rodriguez allegedly said that Harmon directed him in the language to use in the second report. This "confession" allegedly took place as Rodriguez was escorting plaintiff to his bond hearing. Rodriguez denies making any such statement.

Captain Michael Donoghue denies any involvement in the investigation at all. His only role seems to have been speaking to plaintiff at the police station about filing a

---

[6] Zobel indicated at the preliminary hearing that three secretaries in the outer office heard plaintiff "yelling" and that it "put a damper on [their] day." She also noted that plaintiff's wife attempted to calm him down after he left Zobel's office: "[A]nd she was saying to him: Tommy, no, she didn't mean – that's not what it was, that's not the intent of it all, you're just making it worse for our daughter, Laura. He basically told her, if she didn't agree with him that she could tell her story in court."

[7] Incredibly, this person is not a named party to this action.

formal complaint against Rodriguez concerning the fabricated report. Donoghue testified that he "looked into" the allegations, found that there was no basis for them, and informed plaintiff of this.

Plaintiff seeks to bolster his own version of events by touting the results of a polygraph examination, which purport to show that plaintiff did not indicate deception when answering questions about the incident. The examiner asked plaintiff "Did Angel Rodriguez tell you he was ordered to destroy his original report on you?," to which plaintiff answered "yes." The examiner also asked "Did Rodriguez say he was ordered to use certain words in his second report on you?," to which plaintiff responded "yes."[8]

*Claims on Summary Judgment*

Defendants filed motions for summary judgment in two groups, with Hinson and Zobel filing together (the school defendants) and Rodriguez and Donoghue filing together (the law enforcement defendants). The school defendants claim that (1) there is no evidence they were acting "under color of State law" as required by § 1983; (2) there was sufficient evidence to merit a finding of probable cause that plaintiff disturbed schools, which negates any claim for malicious prosecution; and (3) Hinson had nothing to do with the initiation or continuation of the charges against plaintiff, so no cause of action against him for malicious prosecution can stand.

The law enforcement defendants claim that (1) they were not involved in the

---

[8] Of course, the results of this polygraph examination are not admissible as evidence, even in the malicious prosecution setting. See generally Steven J. Gaynor, Annotation, Admissibility of evidence of polygraph test results, or offer or refusal to take test, in action for malicious prosecution, 10 A.L.R.5th 663 (1993 & Cum. Supp. 2006) (noting that only one jurisdiction (Ohio) has ever admitted polygraph results in a malicious prosecution action, and then it was by the defendants to establish their "state of mind" in pursuing the prosecution).

criminal prosecution of plaintiff and thus cannot be liable for malicious prosecution; (2) they are entitled to qualified immunity in their individual capacities on the § 1983 claim; and (3) they are entitled to immunity under the South Carolina Tort Claims Act.

## II.  STANDARD OF REVIEW

Summary judgment is appropriate when, after considering the full evidentiary record, there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). When the party moving for summary judgment does not bear the ultimate burden of persuasion at trial, the burden for summary judgment may be discharged by "pointing out to the court that there is an absence of evidence to support the nonmoving party's case." Celotex Corp. v. Catrett, 477 U.S. 317, 325 (1986). The non-movant must then "make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." Id. at 322.

Evidence should be viewed in the light most favorable to the nonmoving party and all inferences drawn in its favor. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986). However, a mere "scintilla" of evidence will not preclude summary judgment. Id. at 252. The court's inquiry is "not whether there is literally no evidence, but whether there is any [evidence] upon which a jury could properly . . . find a verdict for the party" opposing summary judgment. Id. at 251.

### III.   DISCUSSION

*A. Relevant Law*

   *1.  The Law of Malicious Prosecution.*

"[T]here is no such thing as a '§ 1983 for malicious prosecution' claim." <u>Lambert v. Williams</u>, 223 F.3d 257, 262 (4th Cir. 2000) (quoting <u>Brooks v. City of Winston-Salem</u>, 85 F.3d 178, 183 (4th Cir. 1996)). Rather, it is "simply a claim founded on a Fourth Amendment seizure that incorporates elements of the analogous common law tort of malicious prosecution . . . ." <u>Id.</u> Under South Carolina law,

> [T]o maintain an action for malicious prosecution, a plaintiff must establish: (1) the institution or continuation of original judicial proceedings; (2) by or at the instance of the defendant; (3) termination of such proceedings in plaintiff's favor; (4) malice in instituting such proceedings; (5) lack of probable cause; and (6) resulting injury or damage.

<u>Law v. S.C. Dep't of Corr.</u>, 368 S.C. 424, 629 S.E.2d 642, 648 (2006) (quoting <u>Parrott v. Plowden Motor Co.</u>, 246 S.C. 318, 143 S.E.2d 607, 608 (1965)). The action must be dismissed if plaintiff fails to establish each element by a preponderance of the evidence, "including malice and lack of probable cause." <u>Id.</u> (citing <u>Parrott</u>, 143 S.E.2d at 609).

   *2. The Law of Disturbing Schools and Public Disorderly Conduct.*

South Carolina has a criminal statute outlining an offense of "disturbing schools":

> It shall be unlawful:
>    (1) For any person wilfully or unnecessarily (a) to interfere with or to disturb in any way or in any place the students or teachers of any school or college in this State, (b) to loiter about such school or college premises or (c) to act in an obnoxious manner thereon; or
>    (2) For any person to (a) enter upon any such school or college premises or (b) loiter around the premises, except on business, without the permission of the principal or president in charge.

8

> Any person violating any of the provisions of this section shall be guilty of a misdemeanor and, on conviction thereof, shall pay a fine of not less than one hundred dollars nor more than one thousand dollars or be imprisoned in the county jail for not less than thirty days nor more than ninety days.

S.C. Code Ann. § 16-17-420.

Plaintiff was later charged with public disorderly conduct in violation of Summerville ordinance: "It shall be unlawful for any person to fight, quarrel, engage or participate in any disorderly conduct, commit any breach of the peace or create a disturbance on any of the streets or public places within the corporate limits of the town." The most analogous state law provision is public disorderly conduct, S.C. Code Ann. § 16-17-530. Though usually applied in cases involving disruptive behavior toward police officers, which requires the use of "fighting words," see State v. Bailey, 368 S.C. 39, 626 S.E.2d 898 (Ct. App. 2006), the public disorderly conduct statute has been applied in other contexts. See 1994 Op. S.C. Atty. Gen., No. 94-25 (failure by student or other person to leave school campus or school bus, when directed to by principal, or use of foul or offensive language toward a principal or teacher, can be a criminal violation punishable under either disturbing schools or public disorderly conduct statutes).

## B.  *Withdrawal of Federal Claims*.

At the hearing, plaintiff acknowledged via counsel his intention to withdraw all claims relating to § 1983 and to proceed only on the state law claims.[9] As such, there are

---

[9] More precisely, plaintiff acted under the assumption that his motion to amend the complaint, filed June 22, 2006, had been granted. The motion asserted that the amendment was sought "to correct several typographical errors," but further stated that "the Complaint filed in state court contained several statements that should not have been included." It does not specifically assert an intent to withdraw any cause of action, although it is clear from the proposed amended complaint that all references to "civil rights" and § 1983 were deleted.

no longer any allegations giving this court original jurisdiction over the action. But this does not end the inquiry. Pursuant to 28 U.S.C. § 1367,

> (a) . . . in any civil action of which the district courts have original jurisdiction, the district courts shall have supplemental jurisdiction over all other claims that are so related to claims in the action within such original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution. Such supplemental jurisdiction shall include claims that involve the joinder or intervention of additional parties.

Here, it is clear from the allegations that the state law claims are "so related" to the § 1983 claims that they "form part of the same case or controversy." Id. There is no separate prayer for relief, both claims are based on the same allegations, and all defendants are sued under the same "cause of action." Thus, this court continues to have jurisdiction over this case. See Eriline Co. v. Johnson, 440 F.3d 648, 652 & n.6 (4th Cir. 2006) (noting that defendant is not required to specifically invoke supplemental jurisdiction).

Section 1367(c) provides that the "district courts may decline to exercise supplemental jurisdiction over a state law claim" under certain circumstances:

> (1) the claim raises a novel or complex issue of State law,
> (2) the claim substantially predominates over the claim or claims over which the district court has original jurisdiction,
> (3) the district court has dismissed all claims over which it has original jurisdiction, or
> (4) in exceptional circumstances, there are other compelling reasons for declining jurisdiction.

The only circumstance applicable here is subsection (3); all claims over which this court has original subject matter jurisdiction have been dismissed. However, the statute specifically grants the court the discretion to retain jurisdiction over the state law claims.

10

Id. (noting that the district courts "may" decline to exercise supplemental jurisdiction).

The district courts should retain jurisdiction where, as here, the court is familiar with the facts and issues of the case, the action has progressed to the filing of motions for summary judgment, and a remand to state court would be a waste of judicial resources. See Shanaghan v. Cahill, 58 F.3d 106, 110 (4th Cir. 1995) (factors in exercising discretion include "convenience and fairness to the parties, the existence of any underlying issues of federal policy, comity, and considerations of judicial economy"); see also Ketema v. Midwest Stamping, Inc., No. 05-1866, 180 F. App'x 427, 428 (4th Cir. May 12, 2006) (finding abuse of discretion in declining jurisdiction where it would be a waste of judicial resources to require refiling of suit that had been pending for a "lengthy" period of time and had progressed through discovery, and where statute of limitations had run such that plaintiff would be prejudiced by dismissal"). Therefore, the voluntary withdrawal of the § 1983 claims do not deprive this court of jurisdiction over the state law claims.

### *C. State law claims.*

*1. "Institution or continuation" of proceedings "by or at the instance of" the law enforcement defendants.*

The law enforcement defendants (Rodriguez and Donoghue) assert that they did not participate in the "institution or continuation" of plaintiff's criminal prosecution and that they are accordingly entitled to summary judgment. Plaintiff counters that there is sufficient evidence to go to a jury on this issue. He claims that "if [Rodriguez] had not changed the police report in accordance with Captain Donoghue's instruction the plaintiff

11

would not have been arrested."[10] He also claims that "if the first police report had not been pursued by the Defendant Zobel the Plaintiff would not have been charged with disturbing schools or held over through the preliminary hearing," and that the officers "wrote a false police report in order for the Defendant Zobel to obtain [his] arrest."

A closer look at the record, however, reveals that this is simply not the case. The two warrants issued for plaintiff's arrest were based on the sworn affidavits of principal Zobel, not the alleged fraudulent police report. Moreover, there is no evidence that Zobel acted in reliance on the "fraudulent" report in swearing out the affidavits leading to the arrest warrants, or that the officers arresting plaintiff relied on the police report in taking him into custody.  By all indications, in addition to speaking with Rodriguez just after the incident, Zobel wrote a separate statement later that morning and submitted it to police, independent of the police report.

Further, there is no evidence that the report, assuming for the moment that it was intentionally and fraudulently altered, was used in any way as evidence against plaintiff in charging him or introduced at the preliminary hearing (after which the charge was bound over for further proceedings).  In short, plaintiff has here, at best, a claim of "fraudulently altering police reports," which without more cannot constitute malicious prosecution under any set of facts.

The case is even weaker against Captain Donoghue. The only allegations involving Donoghue are that he "was aware of the abuse of the police powers and

---

[10] In the state court complaint removed to this court, the name of the person who directed Rodriguez to alter the report was a "Detective Harmon." See supra note 6 & accompanying text. Aside from this bald assertion, there is no evidence that Donoghue was involved in the decision to charge plaintiff.

condoned the abuse by his officers." There is no evidence, or even a reasonable inference, that he directly participated in any "conspiracy" against plaintiff, that he ordered the report be changed, or that he ordered the original report to be destroyed. He was simply not involved.

*2. "Institution or continuation" of proceedings "by or at the instance of" defendant Hinson.*

Teacher Hinson also asserts that he should be granted summary judgment in this case because he had nothing to do with the arrest, investigation or charges arising from the incident at the school. The record clearly establishes that, aside from his role in the classroom incident and subsequently as a witness, Hinson had no direct involvement in the resulting legal processes.

Plaintiff's claim that Hinson "provided information that was untrue to the police in order to institute a criminal proceeding against [him]" is simply incorrect. As noted in the discussion of the law enforcement defendants, Rodriguez's investigation had no direct affect on plaintiff's arrest, which was effected due to the warrants sworn out by Zobel. Moreover, Zobel's affidavits were not based on Hinson's statements alone, but from her own investigation and first-hand experience. Thus, any information he may have given to Zobel would not necessarily remove the finding of probable cause.

Finally, the fact that Hinson testified at the preliminary hearing is not determinative, as his role in "instituting or continuing" the proceedings was minimal. Under the reasoning put forth by plaintiff, anyone who gives testimony leading to a charge that is later dismissed would be fair game for a malicious prosecution suit. This is simply not the law. See Nguyen v. Burgerbusters, Inc., 642 S.E.2d 502, 506 (N.C. Ct.

App. 2007) (the "act of giving honest assistance and information to prosecuting authorities does not render one liable for malicious prosecution") (citations omitted); Holmes v. Achor Ctr., Inc., 581 S.E.2d 390, 392 (Ga. Ct. App. 1990) (noting that there is a "fine line of demarcation" between merely relaying facts to law enforcement and directly or indirectly "urging" law enforcement to begin criminal proceedings) (citations omitted). Here, it must be remembered that it was plaintiff himself who called the police; Hinson did not participate in the decision to notify authorities, did not swear out a warrant nor charge plaintiff with any crime.

*3. Probable Cause*.

All defendants further assert that there can be no claim of malicious prosecution where there was probable cause for the arrest and charge. Plaintiff counters that "the record is riddled with conflicting evidence on the point of whether there was probable cause," including insufficient proof and contradictory statements.

The South Carolina Supreme Court detailed the probable cause element of malicious prosecution in its decision in Law v. South Carolina Dep't of Corrections:

> The burden is on the plaintiff to show that the prosecuting person or entity lacked probable cause to pursue a criminal or civil action against him. Probable cause means "the extent of such facts and circumstances as would excite the belief in a reasonable mind acting on the facts within the knowledge of the prosecutor that the person charged was guilty of a crime for which he has been charged, and only those facts and circumstances which were or should have been known to the prosecutor at the time he instituted the prosecution should be considered." In determining the existence of probable cause, the facts must be "regarded from the point of view of the party prosecuting; the question is not what the actual facts were, but what he honestly believed them to be."

368 S.C. 424, 629 S.E.2d 642, 649 (2006) (citations omitted). Moreover,

> South Carolina has long embraced the rule that a true bill of indictment is prima facie evidence of probable cause in an action for malicious prosecution. Although the question of whether probable cause exists is ordinarily a jury question, it may be decided as a matter of law when the evidence yields but one conclusion.

Id. (citations omitted).

Here, there is no dispute that the charge of disrupting schools was heard by a neutral and detached magistrate and was bound over for further proceedings after a preliminary hearing. The judge indicated that "I think there is probable cause. I'm going to bind it over." This establishes a prima facie case that there was probable cause to arrest and charge plaintiff. Id.

The fact that plaintiff may set forth evidence questioning whether there is sufficient evidence to prove elements of the crime is irrelevant; the issue is not whether the charges would stick but whether there was sufficient evidence that "would excite the belief in a reasonable mind acting on the facts within the knowledge of the prosecutor that the person charged was guilty of a crime for which he has been charged." Id. Here, based on the affidavits by which the warrants were obtained, the testimony at the preliminary hearing, and the depositions and affidavits of the parties taken during discovery, there is no doubt that Zobel had probable cause to take the actions she took given what she knew at the time. Id.

The record is replete with statements, from Zobel herself to Hinson to the children in the room to even plaintiff's wife, that plaintiff was "angry," "screaming," "yelling," "flung" open a door, and even "reacted violently" at the school, in the presence of students and staff. Clearly, this is sufficient evidence of probable cause to support a

charge of disrupting schools or public disorderly conduct. As such, plaintiff's action fails.

*4. Malice.*

Though neither party discusses it in much detail, the role of "malice" in a malicious prosecution suit should be examined.

> Malice is defined as "the deliberate intentional doing of an act without just cause or excuse." Malice does not necessarily mean a defendant acted out of spite, revenge, or with a malignant disposition, although such an attitude certainly may indicate malice. . . . Malice also may be implied in the doing of an illegal act for one's own gratification or purpose without regard to the rights of others or the injury which may be inflicted . . . . In an action for malicious prosecution, malice may be inferred from a lack of probable cause to institute the prosecution.

Law v. S.C. Dep't of Corr., 629 S.E.2d at 649 (citations omitted).

Here, because the malice must arise from the "instituting" of judicial proceedings, see id. at 648, no defendant but Zobel could possibly be held liable. Moreover, the magistrate's finding of probable cause creates a rebuttable presumption that there was no malice. Cf. id. ("Malice may be inferred from a lack of probable cause to institute the prosecution," and indictments are "prima facie evidence of probable cause"). Even taking the facts in the light most favorable to plaintiff, he has submitted nothing – aside from rank speculation – to suggest that Zobel deliberately undertook an "illegal" act "without regard to the rights of others," id., or did so "without just cause or excuse," Id. (quoting Eaves v. Broad River Elec. Co-op., Inc., 277 S.C. 475, 289 S.E.2d 414, 416 (1982)).

In light of the discussion herein, the court finds that plaintiff has failed to present "any [evidence] upon which a jury could properly . . . find a verdict" in his favor, Anderson v. Liberty Lobby, Inc., 477 U.S. at 251, and thus that summary judgment is appropriate.

## IV.  CONCLUSION

For the foregoing reasons, it is hereby **ORDERED** that the federal civil rights claims under 42 U.S.C. § 1983 are VOLUNTARILY DISMISSED by plaintiff; the law enforcement defendants' motion for summary judgment [DN 52-1] is GRANTED; the school defendants' motion for summary judgment is GRANTED [DN 48-1]; and this case is dismissed.

**AND IT IS SO ORDERED.**

**DAVID C. NORTON**
**UNITED STATES DISTRICT JUDGE**

**June 8, 2007**
**Charleston, South Carolina**